# Exhibit A

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

KIMBERLY L. COX,          )
          )
    Plaintiff,     )
          )
vs.          )  CIVIL ACTION NO.
          )  2:14-CV-00810-JRG-RSP
MEGAN J. BRENNAN,          )
POSTMASTER GENERAL OF THE  )
UNITED STATE, U.S. POSTAL  )
SERVICES,          )
          )
    Defendant.     )

ORAL DEPOSITION OF KIMBERLY COX

DECEMBER 1, 2016

ORAL DEPOSITION OF KIMBERLY COX, produced as a
witness at the instance of the Defendant, and duly
sworn, was taken in the above-styled and numbered cause
on December 1, 2016, at 9:08 a.m. to 1:35 p.m., before
Brenda Hightower Smith, Certified Shorthand Reporter in
and for the State of Texas, reported by computerized
stenotype machine at the U.S. Attorney's Office, 110
North College, Suite 700, Tyler, Texas, pursuant to the
Federal Rules of Civil Procedure and the provisions
stated on the record or attached hereto.

**Page 2**

## APPEARANCES

FOR THE PLAINTIFF:

MS. REBECCA L. FISHER
ATTORNEY AT LAW
618 SW Military Drive
P.O. Box 781369
San Antonio, Texas  78278
210.988.2977 (phone)
rebeccafisherlaw@gmail.com (e-mail)

FOR THE DEFENDANT:

MR. BRADLEY VISOSKY
U.S. DEPARTMENT OF JUSTICE
UNITED STATES ATTORNEY'S OFFICE
Assistant United States Attorney
Eastern District of Texas
101 East Park Boulevard, Suite 500
Plano, Texas  75074
972.509.1201 (phone)
bradley.visosky@usdoj.gov (e-mail)

- and -

MS. THERESA M. GEGAN
POSTAL SERVICE
SOUTHERN AREA LAW OFFICE
P.O. Box 227078
Dallas, Texas  75222-7078
214.252.6178 (phone)
theresa.m.gegen@usps.gov (e-mail)

ALSO PRESENT:

TAMRA FISHER

**Page 3**

INDEX

PAGE

Appearances.................................... 2
Exhibit Index................................... 3
Stipulations................................... 4

KIMBERLY COX, the witness,

    Examination by Mr. Visosky  ............. 5

Correction and Signature Page............... 162
Reporter's Certificate....................... 164

EXHIBITS

NO.  DESCRIPTION                          PAGE

Exhibit 1
    CA-1 Accident Report dated 8-21-12........  44
Exhibit 2
    CA-17 Duty Status Report dated 8-22-12....  49
Exhibit 3
    29 color photographs (marked 3A-3CC)......  54
Exhibit 4
    Sworn Statement dated 9-31-12 by
    Kimberly Cox................................ 73
Exhibit 5
    DVD video................................. 82
Exhibit 6
    Plaintiff's Second Amended Complaint...... 108
Exhibit 7
    Plaintiff's Response to Defendant's
    First Set of Interrogatories.............. 112
Exhibit 8
    Notice of Removal dated October 3, 2012... 154

Ellipses are used only to show that an answer has
    trailed off and not been interrupted.
Quotation marks are not meant to be interpreted as
    direct quotes.
Uh-huh = yes, affirmative
Huh-uh = no, negative

**Page 4**

P R O C E E D I N G S

    THE COURT REPORTER:  What agreements do
you want to take this under?

    MR. VISOSKY:  Under the Federal Rules.

    MS. FISHER:  Yeah.

    THE COURT REPORTER:  What about
signature?

    MS. FISHER:  Send it to me so she can
sign it.

    Do we need it in any hurried manner?  Do
you need it?

    MR. VISOSKY:  I mean, I think it's just
the usual 30 days.

    MS. FISHER:  Okay.  I just wanted to be
sure in case there's some --

    MR. VISOSKY:  No, I don't care.

    I mean, I might attach it to a summary
judgment or something.

    MS. FISHER:  That's what I was thinking.

    MR. VISOSKY:  But I don't know that I
need --

    MS. FISHER:  I don't have a problem with
you attaching it.  If we have something we change, I'll
address it --

    MR. VISOSKY:  Right.

Page 5

1    MS. FISHER:  -- and bring it to you.  And
2    if not, it is what it is so we can move forward.
3
4              KIMBERLY COX,
5    having first been duly sworn, testified under oath as
6    follows:
7
8              EXAMINATION
9    BY MR. VISOSKY:
10   Q.  Good morning, Mrs. Cox.
11   **A.  Good morning.**
12   Q.  I introduced myself earlier.  I'm Bradley
13   Visosky from the U.S. Attorney's Office.  I represent
14   the Defendant, the Postmaster General, basically the
15   Postal Service in the case.  And I have with me Theresa
16   Gegen, who is Postal Service counsel from -- from
17   Dallas.
18         Thanks for coming in.
19         And this relates to the lawsuit that you
20   brought in federal court against the Postal Service, the
21   Marshall Division of the Eastern District of Texas.
22         Could you just introduce yourself for the
23   record, please.
24   **A.  I'm Kimberly Cox.**
25   Q.  Have you ever had your deposition taken

Page 6

1    before?
2    **A.  I don't believe so.**
3    Q.  Okay.  Just a few things.  I'll be asking you
4    questions just to find out information about your
5    lawsuit.  Will you agree that you can just give clear
6    answers, verbal answers, instead of nods and things like
7    that?
8    **A.  Yes, sir.**
9    Q.  And the purpose of this really is just to find
10   out everything that you know, the facts underlying your
11   lawsuit.  Will you agree to just give full and complete
12   and truthful answers to my questions today?
13   **A.  Yes.**
14   Q.  And if you don't understand a question, feel
15   free to stop me or ask me to rephrase it.  Will you
16   agree to do that if you don't understand the question?
17   **A.  Yes.**
18   Q.  If you do need a break at any time, totally
19   flexible with that.  Just tell your attorney or tell me,
20   and we'll stop.  It's just down the hall.
21         Are you on any medication today that would
22   affect your ability to give truthful and complete
23   answers?
24   **A.  No, sir.  I -- I tell the truth.**
25   Q.  Is there any reason at all why you would not

Page 7

1    be able to give full and complete and truthful answers
2    today?
3    **A.  No, sir.**
4    Q.  Just tell me briefly your education history.
5    Where -- how far did you go in school?
6    **A.  I -- some college.  Did not complete it.**
7    Q.  Go ahead -- where did you go to college?
8    **A.  Kilgore College.**
9    Q.  And how many years did you go?
10   **A.  Just one.**
11   Q.  One year?
12   **A.  Yes.**
13   Q.  Okay.  So as far as degrees, you have a high
14   school diploma?
15   **A.  Yes.**
16   Q.  Any other degrees?
17   **A.  No.**
18   Q.  Any specialized training?
19   **A.  Specialized...?**
20   Q.  Just training at all in any -- any vocational
21   skills or office skills or anything like that.
22   **A.  I've had numerous Postal Service training.**
23   Q.  Okay.  Sure.
24   Where did you work before -- well, what year
25   did you start working for the Postal Service?

Page 8

1    **A.  1997.**
2    Q.  And what did you start as, what was your
3    position then?
4    **A.  A letter carrier.  A casual letter carrier.**
5    Q.  What's that?  What's the difference?
6    **A.  Sub, basically.**
7    Q.  Okay.
8    **A.  Substitute.**
9    Q.  Okay.  Were you a -- I understand there's like
10   a rural or a city carrier?
11   **A.  City.**
12   Q.  City at the time.  Okay.
13   What did you do before you started working at
14   the Postal Service?
15   **A.  The only occupation -- I think there was a**
16   **couple years I didn't -- I didn't work; and then before**
17   **that, I sold cars.**
18   Q.  Okay.  Okay.  Any other types of jobs?
19   **A.  In high school I had -- I worked for**
20   **Walmart --**
21   Q.  Okay.
22   **A.  -- and the cable company, I think.**
23   Q.  Sure.
24   **A.  Yeah.**
25   Q.  So how old were you when you started working

Page 9

1 for the Postal Service?  I think you said '97.

2     A.  I believe I was 24.

3     Q.  Okay.  And just take me -- so you started as,

4 what did you call it, a casual letter carrier.  Just

5 take me through your roles from when you started as a

6 letter carrier to today.

7     A.  I was a little -- a casual letter carrier.

8 Then a TE, which was called a transitional employee.  In

9 August of '98 I become a career employee, which is a

10 PTF.  In 2001 I was promoted to associate supervisor.

11 And then I believe it was 2012, a customer service

12 supervisor.  And then in 2011, PTF letter carrier.  And

13 then in 2014, I became a regular letter carrier.

14     Q.  What's the difference between a PTF and a

15 regular --

16     A.  Part-time flexible.

17     Q.  And so 2014, it was regular?

18     A.  Yes.

19     Q.  Because that's full time?

20     A.  Yes.

21     Q.  One thing that you said confused me.  You said

22 2012 you were a customer service supervisor and then in

23 2011 you were a part-time -- or PTF carrier.

24     A.  Two thousand -- no, 2001 and then in -- I'm

25 sorry.  2002.  I might have said "12."  2002.

Page 10

1     Q.  You became what?

2     A.  Customer service.

3     Q.  Oh, 2002.

4     A.  Yes.

5     Q.  And then 2011, PTF carrier?

6     A.  Yes.

7     Q.  Okay.  What was the reason for -- well, just

8 describe what you did as a customer service supervisor.

9     A.  I supervised basically every craft in the

10 postal -- in the post office:  Clerks, carriers --

11     Q.  And all --

12     A.  -- rural --

13     Q.  Oh, I'm sorry.

14     A.  -- rural, city.

15     Q.  In all of these jobs that we've been talking

16 about, what -- what post office was that in, or were

17 there different ones?

18     A.  There were different ones.

19     Q.  When you became a customer service supervisor

20 in 2002, what post office was that?

21     A.  Tyler.

22     Q.  Okay.  And how long did you stay at the Tyler

23 office?

24     A.  Until 2005.

25     Q.  Okay.  And where did you go after that?

Page 11

1     A.  Kilgore Post Office.

2     Q.  And what was the reason for the move?

3     A.  I applied for a different job just at a

4 different office, a smaller office.

5     Q.  What were the reasons, though, for wanting

6 to -- wanting to move?

7     A.  I just liked working in a smaller office.

8     Q.  Okay.

9     A.  And it was closer to home.

10     Q.  Okay.  So 2005, you moved to the Kilgore Post

11 Office.  That's the main post office, right?

12     A.  Yes.

13     Q.  You were a customer service supervisor.

14         Why in 2011 did you stop being a customer --

15 customer service supervisor and become a PTF carrier?

16     A.  I -- well, basically I wasn't a team player,

17 and so I was targeted.  I -- there was, I think, a

18 $6 discrepancy on my travel card, and so they started

19 looking.  And I traveled a lot because I was on teams.

20         And I basically used my card on a day I didn't

21 travel.  And at this point, I was ready to -- I had been

22 actually thinking about going back to craft anyway.  I

23 was not happy.

24     Q.  You weren't happy as a customer service

25 supervisor?

Page 12

1     A.  No, I was not.

2     Q.  And why is that?

3     A.  It's a stressful job.

4     Q.  So would you say that you enjoyed being a

5 carrier more than a supervisor?

6     A.  Absolutely.

7     Q.  Okay.  You mentioned that you were not a team

8 player.  What do you mean by that?

9     A.  It actually started in 2008 during an EEO

10 and -- for a clerk in the office.  And the -- the post

11 office attorney came in and basically tried to tell me

12 what I was going to say when I testified.  And I told

13 him, no, that I was not going to lie.  And they lost the

14 EEO.  And at that point, it really changed.

15     Q.  And when you say "they lost the EEO," you mean

16 the Postal Service?

17     A.  Yes.

18     Q.  And who was the Postal Service attorney that

19 spoke with you?

20     A.  I have no idea.

21     Q.  You just said it was an EEO?  Is it an EEO

22 filed by an employee --

23     A.  Yes.

24     Q.  -- on their supervision?

25     A.  Yes.

Page 13

1  Q.  Do you remember the name of the --
2  A.  Marilyn Crump.
3  Q.  Is she still there?
4  A.  Yes.
5  Q.  And do you remember what the nature of the EEO
6  allegation was?
7  A.  Discrimination.  I believe it was gender and
8  race.
9  Q.  Okay.  And what's Ms. Crump's gender and race?
10  A.  She is a black female.
11  Q.  And how -- you said that the Postal Service
12  attorney wanted you to lie; is that -- is that right?
13  A.  Yes, sir.
14  Q.  What did the attorney want you to say?
15  A.  Basically that what the -- I guess what the
16  Postmaster was saying happened happened.
17  Q.  And you don't remember what -- I mean, what
18  the issues were, what the Postmaster said had happened?
19  A.  I know it had something to do with -- to do
20  with her job and him wanting her to do some -- a duty
21  that -- a window, be on the window.  And he -- she --
22  she did not want to be on the window.
23     And I mean, I wasn't -- I wasn't directly
24  involved.  I wasn't named in the EEO because it was more
25  of an issue between him and her.  But as her supervisor,

Page 14

1  I was involved in some of the interaction.
2  Q.  Okay.  And who was the Postmaster at the time?
3  A.  Chuck Maxwell.
4  Q.  And did you get along with him?
5  A.  Yes.
6  Q.  Okay.  You mentioned when you moved from a
7  supervisor position back to a PTF carrier position there
8  was some issue with a card.  Just can you explain what
9  you mean by "card" and what exactly the issue was.
10  A.  My travel card, when I was promoted, we're all
11  issued travel cards.  And we didn't have any, like,
12  training on any -- on when you could or couldn't use it.
13  I was on what's called the NRP team.  And so I
14  had to travel back and forth to Dallas at least once a
15  week.  And sometimes I would get my gas the day before
16  or the day after.  And apparently the way the rules are
17  written that I know now, is that you must have traveled
18  that particular day to use that card.  And so...
19  Q.  Okay.  I understand that there was an OIG
20  investigation into that -- into your use of the travel
21  card; is that correct?
22  A.  Yes.
23  Q.  And do you know what the -- or what were the
24  results of the OIG investigation?
25  A.  They just put that they found that I used it

Page 15

1  on days that I had -- that I did not have travel.
2  Q.  Okay.  And there was a --
3  A.  As far as I know, that's what was said.
4  Q.  And I understand there was a settlement that
5  was arrived at between you and the Postal Service out of
6  the whole travel card --
7  A.  Yes.
8  Q.  -- incident?
9  A.  Yes.  Because I went -- I went back to
10  carrying mail.  I offered to give up my position and go
11  back to carrying mail.
12  Q.  And that was part of the settlement; that the
13  dispute would be put behind you, but you would move from
14  a supervisor position to a PTF position?
15  A.  Yes.
16  Q.  Okay.  And that was in two thousand --
17  A.  '11.
18  Q.  -- eleven?
19  A.  Yes.
20  Q.  Okay.  So as a PTF carrier, was that a rural
21  or city.
22  A.  City.
23  Q.  City.
24     And was that -- so was that full time or
25  part-time?

Page 16

1  A.  That's part-time.
2  Q.  So how many hours a week would you work?
3  A.  Oh, I would -- I actually -- there was never a
4  week that I didn't have at least 40 hours.
5  Q.  Oh, okay.  So it says part-time, but it's --
6  A.  Yes.
7  Q.  -- in reality more of a full-time job?
8  A.  Yes.
9  Q.  And so how many days out of a week would you
10  work --
11  A.  Five.
12  Q.  -- on average?  Five.
13     At the time in 2011, did you live I believe in
14  the -- right now you live in Tyler; is that correct?
15  A.  No.  I live in Overton.
16  Q.  Overton.  Okay.
17     And did you live in Overton at the time too?
18  A.  Yes.
19  Q.  Same house, same address?
20  A.  Yes.
21  Q.  And would you drive to work?
22  A.  Yes.
23  Q.  Would you say on average about five days a
24  week?
25  A.  Yes.

Page 17

1    Q.  And when you became -- or returned to a PTF
2  city carrier position in 2011, who was your direct
3  supervisor?
4    **A.  I -- I don't recall.  They would -- they had**
5  **fill-in supervisors for a while.  So I guess -- I**
6  **believe Pat Beets was there as the OIC, the officer in**
7  **charge when -- because the Postmaster job was not filled**
8  **at the time either.**
9    Q.  Is the OIC above the Postmaster?
10    **A.  No.  OIC is the acting Postmaster.**
11    Q.  Oh, okay.  Okay.  But assuming both positions
12  are filled, that you have a Postmaster filled and an
13  OIC --
14    **A.  No, you can't do --**
15    Q.  Oh, you don't --
16    **A.  You will not have both.**
17    Q.  Oh, you don't have both?
18    **A.  No.**
19    Q.  Okay.  Does the Postmaster have any supervisor
20  over him or her in the post office?  I mean, not the
21  post office generally.  But in like the Kilgore Main
22  Post Office, --
23    **A.  No.**
24    Q.  -- does the Postmaster report to anybody?
25    **A.  No.**

Page 18

1    Q.  How many customers -- so before 2011 you --
2  2002 to 2011, you were a customer service supervisor.
3  How many other -- were there any other customer service
4  supervisors during that time?
5    **A.  In Kilgore?**
6    Q.  In the Kilgore office.
7    **A.  No.**
8    Q.  So you were the only one?
9    **A.  Yes.**
10    Q.  So then after you left that position in 2011,
11  you're saying just people filled in for a time?
12    **A.  Yes.**
13    Q.  And who was the first person that filled in
14  that position full time?
15    **A.  I have no idea.**
16    Q.  Okay.  Would you say that you generally enjoy
17  your job at the Postal Service?
18    **A.  Yes.**
19    Q.  Do you get along with your co-workers?
20    **A.  Yes.**
21    Q.  Do you get along with the managers?
22    **A.  Yes.**
23    Q.  Do supervisors ever come with you on your
24  routes?
25    **A.  They have, yes.**

Page 19

1    Q.  Okay.  How -- how frequently?
2    **A.  I believe since I've had the route that I have**
3  **now, which was in December of 2014, once.  I believe**
4  **that is correct.**
5    Q.  And do you remember who that supervisor was?
6    **A.  Angie Rojas.**
7    Q.  And when other carriers are doing their
8  routes, you wouldn't typically or you wouldn't ever,
9  really, ride along with other carriers when they're
10  doing their routes, right?
11    **A.  Myself?**
12    Q.  Yeah.
13    **A.  Only if I was in a training capacity.**
14    Q.  Okay.  Do you do training?
15    **A.  I have.**
16    Q.  Okay.  Since 2011 have you done training?
17    **A.  Yes.**
18    Q.  Okay.  Do you have access to other employees'
19  employment records?
20    **A.  No.**
21    Q.  When did you first meet Cynthia Freeman?
22    **A.  Casually, sometime during the time I was a**
23  **supervisor at the Kilgore Post Office.**
24    Q.  And what do you mean "casually"?  I mean, like
25  how would that -- how would that encounter have

Page 20

1  happened?
2    **A.  She had a position at the plant, at the**
3  **processing distribution center.  And it was -- at the**
4  **time, it was outside of Tyler.**
5    Q.  Okay.
6    **A.  And that position required her to visit post**
7  **offices.  And she would check, I guess, the quality of**
8  **the mail.  And I had encountered her a couple of times.**
9    Q.  During those times, just those couple
10  of times while you were still a supervisor, did you have
11  any problems with Mrs. Freeman?
12    **A.  No.**
13    Q.  And I understand that you have allegations in
14  this case that at some point --
15      Well, let me ask you this:  When did
16  Mrs. Freeman become -- I understand at some point she
17  became a customer service supervisor at the Kilgore Post
18  Office.  Is that correct?
19    **A.  Yes.**
20    Q.  When did she take on that role?
21    **A.  October 2011.**
22    Q.  Okay.  And was that a full-time position?
23    **A.  Yes.**
24    Q.  Okay.  So would she have been the first full
25  time customer service supervisor at the Kilgore Post

Page 21

1 Office since you were in that role?

2    A.  Yes.

3    Q.  Okay.  And when she started in that role, did

4 you get along with her?

5    A.  I did -- I did not have a lot of interaction

6 with her, because the Postmaster runs the workroom

7 floor.

8    Q.  And in October of 2011, who was the

9 Postmaster?

10    A.  Joe McQuiston.

11    Q.  And when did he become the Postmaster?

12    A.  October 2011.

13    Q.  So he came the same month that Mrs. Freeman

14 did?

15    A.  The same exact time.

16    Q.  Okay.  Did you know Mr. McQuiston before that?

17    A.  Yes.

18    Q.  And how did you know him?

19    A.  He had OIC'd at the Kilgore Post Office

20 before.

21    Q.  Okay.

22    A.  And also he was a station manager in Tyler --

23    Q.  Okay.

24    A.  -- when I worked will.

25    Q.  Say from October 2011 when Mr. McQuiston

Page 22

1 became the Postmaster, before that time, up until around

2 October 2011 time frame, did you have any problems or

3 issues with Mr. McQuiston?

4    A.  No.

5    Q.  Would you say that he was a good manager?

6    A.  He -- he knows his job.

7    Q.  What about Mrs. Freeman, would you say that

8 she knew her job?

9    A.  Not the customer service side.  It -- you

10 know, at the beginning, of course, I mean, she was

11 learning.

12    Q.  Okay.  But did she -- in your mind, did you

13 ultimately perform that job satisfactorily?

14    A.  I assume.  I mean, that would be her boss's

15 judgment to make, --

16    Q.  Okay.

17    A.  -- not mine.

18    Q.  And I understand at some point -- well, you

19 make allegations that Mrs. Freeman created a hostile

20 working environment.  Can you just describe -- well,

21 first of all, when did that begin?

22    A.  Around spring 2012.

23    Q.  And what do you mean by "hostile"?  What --

24 what exactly did she do that was hostile or wrong in

25 your opinion?

Page 23

1    A.  She would -- I noticed -- I started noticing

2 that she would single out white females, question our

3 performance more.  And with -- I'm not sure how to

4 say -- I guess just question their performance more than

5 anyone else's.

6        The -- the tone of the voice.  The -- the

7 manner that she would speak to us.  The -- the level of

8 her voice when she spoke to us.  It -- we're a small

9 post office, so we can -- I could hear her talk to other

10 white females the way she talked to me.

11        And -- and that's when -- but normally she

12 would only on Saturday run the floor.  And then I

13 started reporting in on Monday.  But I would never say

14 anything directly to her.  I tried to just (indicating)

15 keep it as pleasant as possible.

16    Q.  When you say how she spoke to white females,

17 what -- what white females are you talking about?

18    A.  I noticed it with Tina Jones, who was on the

19 route next to mine; Sandra Anderson, who is a carrier

20 there; the -- some of the white rural carriers.  It --

21 and we -- you know, people would make comments about the

22 way they were talked to.

23    Q.  When you say "people would make comments about

24 the way they were talked to," who -- who specifically?

25    A.  I know Tina Jones did, I know Sandra Anderson

Page 24

1 did, I know Katrina Keith did, Cindy Reeves, Kelly

2 Watson, Mae Ward, Sheila Hooks, Rachel Knoble, Angie

3 Lopez.  There's quite a bit.

4    Q.  So all those people that you mentioned, were

5 you -- did you witness personally any interaction

6 between Mrs. Freeman and those witnesses?

7    A.  Some of them, yes.

8    Q.  Which ones?

9    A.  Tina Jones, Sandra Anderson, Cindy Reeves,

10 Kelly Watson, Sheila Hooks.  I believe there could have

11 been -- I believe there was one with Katrina Keith.

12 There were, you know, quite a few different ones.

13    Q.  Let's just say for Tina Jones, for example,

14 what did Mrs. Freeman say to Tina Jones that you -- I

15 mean, what was wrong with how -- in your mind with how

16 Cynthia Freeman interacted or spoke to Tina Jones?

17    A.  She would -- I'm trying to remember if I --

18 the exact instance.  Mainly it was when she would ask

19 about, say, a carrier taking a little more time than

20 they were authorized or whatever.

21        Which is fine.  There's absolutely nothing

22 wrong with us being questioned.

23        Just the tone she would use that the -- she a

24 lot of times would scream at people when they were

25 walking across the workroom floor.  It's just a -- it's

Page 25

1 just a hostile type of voice that she used.  And a lot
2 of -- most of the time it was loud enough for us all to
3 hear it, and so it's hard not to hear other.
4     Q.   Did you ever see Mrs. Freeman raise her voice
5 to any of the male employees?
6     A.  I don't believe so.
7     Q.   What about any of the female non-white
8 employees?
9     A. I don't believe so.
10    Q.   Okay.  But apart from the tone of voice, did
11 you ever hear Mrs. Freeman make any racially charged
12 comments to any of the white employees?
13    A.  I don't -- not that I can recall at the
14 moment.
15    Q.   So the -- the comments or the -- the tone of
16 voice and statements that you identified that
17 Mrs. Freeman made to the white female employees, did
18 those comments relate to anything other than issues
19 dealing with the work that they were doing for the
20 Postal Service?
21    A.  There would be -- I'm not -- I'm trying to
22 think of the -- there would be most of it would have to
23 do with post office, you know, performance and stuff I
24 guess.  But it was -- I'm not recalling a specific
25 instance at the moment.  But...

Page 26

1     Q.  And so during this time you were a PTF city
2 carrier, --
3     A.  Yes.
4     Q.  -- correct?
5          And how -- you would work on average about
6 eight hours a day?
7     A.  Yes.
8     Q.  Of those eight hours, how many hours would you
9 be -- or how much time would you spend in the -- in the
10 physical post office itself?
11    A.  Usually an hour to an hour and a half in the
12 morning.
13    Q.  Okay.
14    A.  And then a very few minutes in the afternoon.
15    Q.  Okay.  And the rest of the time, you would be
16 on your route?
17    A.  Yes.
18    Q.  And for the most part, you would be on the
19 route by yourself, correct?
20    A.  Yes.
21    Q.  And I think you said that the -- the comments
22 that you identified that Mrs. Freeman made about the
23 tone of voice and whatnot started around spring 2012; is
24 that correct?
25    A.  I believe so.

Page 27

1     Q.   Okay.  Do you recall specifically any comments
2 that she made to you around that time frame that you
3 found objectionable?
4     A.  Yes.
5     Q.  And what were those?
6     A.  There was one that particularly that sticks
7 out.  Was -- I had a -- as a PTF, as any sub city
8 carrier, you can have a -- what's called a "mini bid" on
9 a route.  So if a regular route is vacant for a period
10 of time, then you put a mini bid in on it and then you
11 are treated as the regular on that route.
12          And as so, the postal management under our
13 contract is not allowed to take -- is not allowed to
14 take any of that route away from you to give you
15 somebody else's route.  They can take your overtime
16 away, but -- but they could not take it away from --
17 take it away from this route and give me another route.
18          Well, Overton, which is about 12 miles away,
19 their post office was moved -- their carriers were moved
20 into the Kilgore Post Office.  So on average, two city
21 carriers have to go to Kilgore every day to carry mail.
22 So they have to travel to Kilgore and back.
23          And on this particular day our cases are lined
24 up on the workroom floor.  And behind them are the racks
25 that have our DPS, which is the letter mail that comes

Page 28

1 in order in trays.
2          And I had walked around and was back here
3 behind the cases with my DPS.  And Gary Ryan, who is a
4 fellow carrier, came up and he said, which part of your
5 route are you giving off?  And I said, what are you
6 talking about?  And he said, well, Cynthia said she's
7 going to take some off of your route so that you can go
8 to Overton.  And I said, oh, okay.
9          And I -- because I would never -- never
10 confront her because of the -- the way she spoke to me,
11 I just made a comment to him, I said, okay, well, I'll
12 just -- I'll talk to Joe and make sure he understands
13 that she's violating the contract and go on with it.
14 Wasn't even planning on filing a grievance, which I
15 could have.
16          And -- and so he -- he's like, okay.  And that
17 was the end of our conversation.
18          Well, I came back around the case.  And
19 unbeknownst to myself, Jeff McCann, who is a carrier,
20 had gone to Cynthia and explained to her that she was
21 violating the contract and that I could file a grievance
22 because she was taking off of this route that I had a
23 mini bid on to -- to get me to go to Overton.
24          And so I come around the case and I'm standing
25 in the middle of the workroom floor.  And I just said,

Page 29

1  what part of my route do I need to pull off?  And she
2  started screaming at the top of her voice to me,
3  you're -- I'm not taking anything off.  You're not --
4  you're not filing a grievance on me.  You're not filing
5  a grievance on me.
6        She's screaming.  The whole entire post
7  office -- because we're in like a -- probably a
8  rectangle.  And the -- so the rural carriers were over
9  here and the city carriers are over here (indicating).
10  Everything just stopped.  And everybody was just like
11  (indicating).  And I was just like, okay.  And I just
12  went back to work.
13        And then Jeff McCann came to me and he's like,
14  I am so sorry.  He's like, I was just trying to let her
15  know that she is violating the contract.  And I did not
16  know that was going to -- that was going to happen.  I'm
17  so sorry.
18        And I was like, you know, it's fine.  And you
19  know -- and that was just one that really stuck out.
20  But, you know, I wasn't surprised at that point.
21        Q.  You might not know exactly, but do you
22  remember approximately when that -- when that whole
23  incident happened?
24        A.  I'm -- I would think it was -- it was in the
25  summer.  I believe it was a weekday because -- and I

Page 30

1  guess -- I don't know if Joe was on vacation and that's
2  why she was running the workroom floor.  I -- I don't
3  remember the exact date, no.
4        Q.  So who -- who would ordinarily run the
5  workroom floor?
6        A.  Joe McQuiston.
7        Q.  So how much interaction would you have on a
8  daily basis generally with Mrs. Freeman?
9        A.  Not very much on a daily basis.
10        Q.  And by "not very much" -- you said you were in
11  the office maybe, what, an hour and a half?
12        A.  She's not there --
13        Q.  An hour, hour and a half?
14        A.  -- during that time.
15        Q.  She wouldn't be there?
16        A.  No.  Only on Saturday when he's off.
17        Q.  Okay.
18        A.  Which is his day off.
19        Q.  Okay.  So she would only be there one day of
20  the week -- of the -- of your work week essentially?
21        A.  On average, yes.
22        Q.  On average.
23        A.  And on that one day, you would only be in the
24  post office for how long?
25        A.  An hour to an hour and a half --

Page 31

1        Q.  And of that hour --
2        A.  -- typically.
3        Q.  Say on the Saturdays of that hour, hour and a
4  half, how much time would you spend interacting with
5  Mrs. Freeman?
6        A.  Only if I had a question or if she came to me
7  with a question or to tell me what my leaving time is.
8        Q.  Okay.  This incident where you said that
9  Mrs. Freeman raised her voice, you said that there were
10  other employees around.  Who -- who specifically
11  witnessed that incident?
12        A.  I know Jeff McCann did and Gary Ryan.  They
13  were involved.  Really, every carrier on the floor, I'm
14  sure.
15        Q.  Okay.
16        A.  I couldn't tell you the exact who was there
17  that day.
18        Q.  Okay.  But other than Jeff McCann, Gary --
19            Gary who?
20        A.  Ryan.
21        Q.  -- Ryan, just right now to your recollection,
22  you can't think of any specific people that would have
23  witnessed that?
24        A.  I believe Sandra Anderson was there and I
25  believe Efron Fryer was there.  I believe Tina Jones was

Page 32

1  there.  The rural carriers, I'm not sure who was --
2        Q.  Okay.
3        A.  -- or the clerks.
4        Q.  And you said summer 2012.  Do you -- would
5  this have been early summer, late summer?
6        A.  I have no --
7        Q.  You don't --
8        A.  -- idea.
9        Q.  -- you don't remember.
10            And you said that in your mind the -- the -- I
11  guess we'll just call it like the "route dispute."
12        A.  Uh-huh.
13        Q.  Is that -- is that fair, just for shorthand?
14        A.  I guess.
15        Q.  That that -- what -- well, let me put it this
16  way.  In your mind, what Mrs. Freeman was doing was in
17  violation of a contract you said?
18        A.  We have a contract --
19        Q.  A contract --
20        A.  -- with the union.
21        Q.  -- between who?
22        A.  Union and the NALC.
23        Q.  Okay.
24        A.  Which is the letter carrier union and the
25  Postal Service.

Page 33

1    Q.  So you thought Mrs. Freeman had violated the
2  union Postal Service contract.  Did you -- what action
3  did you take to dispute that or try to fix it?
4    A.  Any time anything happened that I knew that
5  she was, you know, violating the contract, I would wait
6  until Joe McQuiston came back to work and I would just
7  say, hey, you might want to let her know that this is --
8  you know, this is -- you know, that this is violating
9  the contract or whatever.
10    Because I went out of my way not to, I guess,
11  try to aggravate her because, you know...
12    Q.  Okay.  Tell me specifically, you know, for
13  example, for this -- this route dispute that you thought
14  was in violation of a contract.  You go to Joe
15  McQuiston.  What did you, to your recollection, tell
16  him?
17    A.  I told him about what -- you know, what she
18  was -- you know, that she was planning on taking off the
19  route.  Which she did not.  After Jeff McCann told her
20  that she was violating the contract, she did not take it
21  off of my route.  She did not take any off of my route.
22  I guess she just found someone else, I'm not sure.
23    But I told him about what happened about me
24  telling Gary Ryan that I was going to, you know, just
25  tell him.  You know, just let him know, hey, you know,

Page 34

1  just might -- because it could cause -- if someone
2  pushed the issue, they could file a grievance.
3    But I was not planning to file a grievance.  I
4  was going to do as I was told by my supervisor.
5    Q.  Apart from what you just said, can you think
6  of anything else that --
7    (Watch beeping.)
8    A.  I'm sorry.  I don't know how to do this.  I'm
9  trying to -- this is new, and I don't know how to turn
10  this off.
11    (Discussion off the record.)
12    Q.  (By Mr. Visosky) Okay, Mrs. Cox, apart from
13  what you just told me that you told Mr. McQuiston, can
14  you think of anything else that you told Mr. McQuiston
15  about that incident?
16    A.  About that particular incident?
17    Q.  Uh-huh.
18    A.  I don't believe so.  I just -- I told him, you
19  know, what she had planned to do and that, you know,
20  hey, just make sure maybe --
21    (Watch beeping.)
22    A.  I'm so sorry.
23    -- that --
24    Well, I thought I had it.  I tried to put it
25  on airplane mode.  You think if I just turned off my

Page 35

1  phone?
2    MS. FISHER:  Just take a minute if you
3  don't mind.
4    MR. VISOSKY:  Yeah.
5    (Discussion off the record.)
6    A.  But I told him, you know, about that she, you
7  know, just -- you might just make sure she knows.  And
8  then I told him about her screaming at me and what she
9  said.  And that was it.
10    Q.  (By Mr. Visosky) What was Mr. McQuiston's
11  response, what did he do?
12    A.  He -- he would either say, she's all right.
13  Because I've -- there was repeated times that I reported
14  different things to him.  So he would either say, I'll
15  talk to her; okay, I'll talk to her.  Or, she's all
16  right.
17    Q.  And were you satisfied with that answer?
18    A.  Yes.  I mean, that's really all I wanted was
19  for him to take care of the issue.
20    Q.  And did he take -- I mean, did he take care of
21  it?
22    A.  It continued, so I guess not.  I...
23    Q.  So -- so Mrs. Freeman took some action with
24  relation to your route that you thought was violating
25  the union contract.  Did you ever file a grievance

Page 36

1  because of this?
2    A.  She didn't actually do it.
3    Q.  Oh, she didn't do it?
4    A.  After she screamed at me, she -- that's what
5  she screamed at me, that I'm not taking any off your
6  route.  I'm not -- you're not filing a grievance on me.
7  But she's screaming this.
8    Q.  Okay.  But that --
9    A.  And --
10    Q.  Sorry.
11    A.  On the workroom floor.
12    Q.  But that was the result that you wanted
13  ultimately, right?  I mean, not the screaming part, but
14  just the --
15    A.  For her not to take off the route?
16    Q.  Right.
17    A.  That was the correct -- that was the correct
18  route for her to take.
19    Q.  Okay.
20    A.  Because it is a violation of the union
21  contract.
22    Q.  So apart from this -- this route incident
23  we've been talking about, did you have any other
24  interactions with Mrs. Freeman where you thought that
25  what she did was inappropriate or hostile towards you?

Page 37

1    A.   Definitely.  Numerous times she would say
2  things like -- she would come and ask me something about
3  my time or -- or something.  And I -- and I would
4  always -- you know, I do the best I can.
5        And there -- on more than one occasion she
6  would say things like:  Well, your best ain't good
7  enough; or, you know, that's not good enough; you
8  have -- you have to do better.  That type of thing.
9    Q.   Like how many times would you say that that --
10 that things like that happened?
11   A.   Pretty much became a regular occurrence,
12 especially for the last two months, which would be, I
13 guess, July and August, some in June probably, of 2012.
14   Q.   And when you say "regular occurrence," like
15 how -- well, I guess Mrs. Freeman was only there where
16 you were with her at the same time -- or you were both
17 even working the same day at the post office in Kilgore
18 on Saturdays, right?
19   A.   Yes.
20   Q.   So in July and August, how many of those
21 Saturdays would Mrs. Freeman say or do something you
22 thought was inappropriate or hostile to you?
23   A.   Pretty much every Saturday I was there.
24   Q.   Okay.  And apart from what you said earlier
25 about the "your best isn't good enough" and -- and

Page 38

1  things of that nature, anything specifically you
2  remember Mrs. Freeman saying that you thought was
3  inappropriate?
4    A.   It was usually -- the only type of interaction
5  I would have with her would be to do something with my
6  work.  And those were usually the -- basic comments
7  she would make.  I don't recall --
8    Q.   Okay.  That's fine?
9    A.   -- at the time the exact things she said.
10   Q.   And during this time frame, July and August
11 when Mrs. Freeman on the Saturdays would -- would say
12 something you felt was inappropriate, did you ever talk
13 with Mr. McQuiston about it?
14   A.   Yes.  Every Monday before -- the after.  Or if
15 I wasn't there or he wasn't there on Monday, the Tuesday
16 after every single occurrence, I would report it to him.
17   Q.   And what did -- what would you tell him?
18   A.   I would tell him exactly what was said and the
19 manner it was said.  It started with pretty much all the
20 white females.  But by this point, it became more me.
21 And so I -- I didn't -- at the time I didn't know really
22 what to think.  You know, why -- why am I being singled?
23   Q.   How many other -- I mean on average, how many
24 other carriers would be in the -- working on a Saturday
25 at the Kilgore Post Office?

Page 39

1    A.   There are twelve rural routes, so twelve
2  carriers there.  And there are seven full city routes
3  and two auxiliary routes.  So anywhere from seven to
4  nine average city carriers.
5    Q.   Did you ever tell Mr. McQuiston that you
6  thought that Mrs. Freeman was -- spoke to you in an
7  inappropriate way to your mind because of your race or
8  gender?
9    A.   Yes.
10   Q.   And -- and what specifically were you upset
11 about that?
12   A.   I started when this all began saying she is
13 singling out the white females.  And then it became more
14 she's singling out me.
15   Q.   And what was Mr. McQuiston's response when you
16 would tell him that?
17   A.   He would always say either, oh, she's all
18 right, or I'll talk to her.
19   Q.   Okay.  And can you -- can you narrow it
20 down.  And if you can't, that's fine.  But you mentioned
21 July, August 2012, a specific time frame that you would
22 have spoken to Mr. McQuiston about Mrs. Freeman's
23 conduct?
24   A.   Narrow -- narrow --
25   Q.   Well, I mean, just July, August is what you

Page 40

1  said of the 2012 time frame.  Are there specific dates
2  or -- or ranges within that time frame where you have --
3  would have spoken with Mr. McQuiston?
4    A.   I believe the July, August is the time frame
5  that I was being singled out.  The report of white
6  females actually started before that, probably in the
7  spring.  That's why I said spring and summer of 2012.
8    Q.   Okay.
9    A.   And so by July, August, I'm being singled out.
10   Q.   So you're saying starting in spring 2012,
11 somewhere around that -- that time frame, you would have
12 told Mr. McQuiston or made some kind of complaint to him
13 about Cynthia Freeman's treatment of white females?
14   A.   Yes.
15   Q.   Okay.  And did Mr. McQuiston ever respond or
16 take any action that you thought, you know, was
17 satisfactory in response to your complaints?
18   A.   I have no idea what he did.
19   Q.   Okay.  Did you ever file any EEO complaints
20 arising out of those -- the complaints that you had
21 about Mrs. Freeman during that time?
22   A.   No.
23   Q.   Why not?
24   A.   I guess I just figured that he would deal with
25 it eventually.  I -- I don't know.  I -- I didn't really

Page 41

1  know a whole lot about the EEO process at that time.
2  I figured he was dealing with it and, you
3  know, if I reported enough, then it will stop.  Because
4  I continued to report.
5  Q.  Did you think that, you know, you were still
6  able to do your job as a carrier, notwithstanding
7  whatever Mrs. Freeman was doing, and that you would just
8  deal with whatever?
9  A.  Yes, I did my job.
10  Q.  Did your job performance suffer in any way
11  during that time period?
12  A.  I don't believe so.
13  Q.  Did you receive any discipline during that
14  time period?
15  A.  No.
16  Q.  Okay.
17  Okay.  So you had an accident in -- I believe
18  it was August 21st, --
19  A.  Yes.
20  Q.  -- 2012.
21  Just explain briefly how that -- how that
22  happened.
23  A.  I was -- had pulled my mail truck up and
24  parked it where it was at -- there's -- it's kind of an
25  odd curb.  The curb -- it's a regular curb, and then

Page 42

1  there's an elevated piece of concrete that angles down
2  and merges with the lower concrete.
3  And I had -- I was going to have to go inside
4  of a business where the vehicle was going to be
5  completely out of view.  And there were people present.
6  So I rolled up my window and stepped out of
7  the vehicle, and turned and locked the vehicle.  And
8  when I turned, I was by right where they merge.  And my
9  foot got caught on that little lip there, and I fell.
10  Q.  Okay.  And I guess Postal Service policy, did
11  you call someone, a supervisor or someone?
12  A.  Yes.
13  Q.  Who did you call?
14  A.  I believe I talked -- I'm not sure if Joe was
15  there that day.  I know Cynthia was the one that came
16  after.  It was about 30, 30 to 40 minutes I sat there
17  and waited for her.
18  Q.  And so was this a Saturday or...?
19  A.  The 21st?  No, it was not a Saturday.
20  I believe maybe Joe was working that morning.
21  But I'm not sure who I talked to when I called the post
22  office, but she was sent --
23  Q.  Okay.
24  A.  -- to take me.
25  Q.  And once she got there, I mean, what did she

Page 43

1  say and do and...?
2  A.  She just took me to the hospital.
3  Q.  Okay.  Was she -- was she nice to you during
4  this time?
5  A.  She didn't really speak.
6  Q.  Didn't say anything?
7  A.  Not -- no.
8  Q.  Nothing.
9  Did she ask you how you were or anything like
10  that?
11  A.  No.
12  Q.  No?  Okay.
13  But she drove you to the hospital?
14  A.  Yes.
15  Q.  Okay.  And did she wait with you in the
16  hospital?
17  A.  Yes.
18  Q.  Was it the emergency room or --
19  A.  Yes.
20  Q.  And who did you see there?
21  A.  It was Good Shepherd Medical Center.  I'm not
22  sure --
23  Q.  Okay.
24  A.  -- of the physician.
25  Q.  And how long were you at the doctor's office?

Page 44

1  A.  I have no idea.
2  Q.  Okay.  And was Mrs. Freeman there the whole
3  time?
4  A.  Yes.
5  Q.  And did she drive you back?
6  A.  Yes.
7  Q.  Okay.  And did you continue -- you obviously
8  didn't continue working that day, right?  You went home
9  or...?
10  A.  I was told to fill out some paperwork.
11  Q.  Okay.
12  A.  And I believe by the time that -- it was close
13  to the end of the regular workday for myself anyway.
14  I'm not sure of the exact time.
15  (Exhibit 1 marked.)
16  Q.  (By Mr. Visosky) All right.  Mrs. Cox, I'm
17  handing you what's been marked as Exhibit 1 to your
18  deposition.
19  And I believe the first part -- I mean, just
20  looking in it, it's a -- it's a report of accident from
21  your August 21st accident.  But I want you to turn, if
22  you look at the bottom of these pages, there's a USPS
23  number.  It's number 2853?
24  MS. FISHER:  2853?
25  MR. VISOSKY:  Yeah.

Page 45

MS. FISHER:  Okay.

Q.  (By Mr. Visosky) This is your CA-1 form, correct?

A.  Yes.

Q.  And can you describe generally what is a CA-1 form?

A.  That's just the form that -- that you have to fill out when you have an accident.

Q.  Okay.  Is that your signature?

A.  Yes.

Q.  And does this appear to be a true and correct copy of your CA-1 form?

A.  I believe so.

Q.  Okay.  And let's see.  You dated this August 21st, 2012, the date of your accident, correct?

A.  Yes.

Q.  And so what happened is, you have the accident on August 21st, you submit the CA-1 form.  Did you -- do you take any leave time after that?  Or just kind of tell me how you -- how the accident affected your -- your work.

A.  I believe they -- I believe they made you take three days of sick leave, if I remember correctly. That's -- as far as I remember, that's what happened.

Q.  And when you say they made you take sick

Page 46

leave, I mean, who are you talking about?

A.  That's what Joe said --

Q.  Okay.

A.  -- when...

Q.  And that was paid sick leave?

A.  I have -- I have sick leave, yes.

Q.  And you're paid on those --

A.  Yes.

Q.  -- when you use sick leave?  Okay.  So you were on sick leave three days.  Then what happened after that?

A.  I was on limited duty.  And so they had me sit in a room for eight hours.

Q.  And what room was that?

A.  There's a room at the front of the post office.  They use it for the passport office -- passport office now.

Q.  Okay.  And what was it at the time, was it the passport office at the time?

A.  I don't think so.

Q.  Okay.  And are there phones and stuff in there?

A.  There is.

Q.  And what was your duties in the room?

A.  I was told I was not allowed to answer the

Page 47

phone.

Q.  And why is that?

A.  The NRP process.

Q.  And what's NRP?

A.  It's basically where they were -- they sent permanent limited duty people home, I guess.  Where -- whereas, the post office was being required to find work for them, they stopped.  And so they would send them home, and OWCP was paying them.

Q.  Oh, okay.  So there were people that under some kind of rule or regulation had to answer the phones because that was the only function that they could perform under whatever you're talking about, NRP?

A.  But before this point.

Q.  Okay.

A.  But by this point, I believe they were already all sent home.

Q.  So there was no one there at the time?

A.  The office people; the clerks and --

Q.  Okay.  So what --

A.  -- the supervisors.

Q.  Okay.  So?

A.  -- or supervisor and Postmaster.

Q.  So why couldn't you answer the phones?

A.  I was told that it was a -- not a function

Page 48

that a limited duty person was allowed to do.

Q.  Allowed to do under some kind of policy or procedure?

A.  I guess.

Q.  Okay.  And you couldn't drive your route during this time, right?

A.  Yes.  Correct, I could not.

Q.  Okay.  And so what would -- so you're in the passport room.  Did you have any -- I mean, any responsibilities or duties during that time?

A.  No.

Q.  But you were paid during that time?

A.  Yes.

Q.  And paid the same as if you had been --

A.  Yes.

Q.  -- carrying your route?

Did you have any complaints about the actions that they -- that the Postal Service took to accommodate your work restrictions of putting you in the passport room?

A.  I didn't complain to anyone.  I didn't say anything.

Q.  Okay.  But I mean, in this lawsuit, do you have any complaints?  Are you alleging that there was anything wrongful in that that the Postal Service did?

Kimberly Cox

13 (49 - 52)

Page 49

1    A.  No.  I figured they were doing what they were
2  told to do.
3    Q.  And so how long -- how many days did you do
4  your job, you know, in that room when you couldn't carry
5  your route?
6    A.  I believe there was only four, maybe five
7  total days.
8    Q.  Okay.
9    A.  It wasn't -- it wasn't a lot.
10    (Exhibit 2 marked.)
11    Q.  (By Mr. Visosky) I'm handing you what's marked
12  as Exhibit 2.
13    MS. FISHER:  Thank you, sir.
14    Q.  (By Mr. Visosky) And once you've had a minute
15  to look that over, can you just describe for the record
16  what this is.
17    A.  This is the form where the post office on the
18  left side says that these are my work duties, these
19  are -- the times you see there are roughly how many
20  hours a day that I do each of the different A through L.
21    And then on the right side is what the
22  physician says that I can do these this many hours
23  for -- in a day at work.
24    Q.  Okay.  And I think just within the government,
25  this is called a CA-17 form.  Does that sound familiar

Page 50

1  to you?
2    A.  That's the form number that's at the bottom,
3  yes.
4    Q.  And does this appear to be a true and correct
5  copy of the CA-17 form listing your work restrictions
6  after the August 21st, 2012 accident?
7    A.  I believe so.
8    MR. VISOSKY:  Are y'all doing okay?  I'm
9  with to shift gears.
10    MS. FISHER:  I was going to tell you when
11  you got to a breaking point --
12    MR. VISOSKY:  Yeah.
13    MS. FISHER:  -- maybe a quick break --
14    MR. VISOSKY:  Off the record.
15    (5-minute break taken.)
16    MR. VISOSKY:  Are y'all ready.
17    MS. FISHER:  Yes, sir.
18    Q.  (By Mr. Visosky) Okay.  Mrs. Cox, we're back
19  on the record.  Just want to talk about, you know, the
20  estate sale thing.
21    So you have your accident on August 21st,
22  2012.  You're put on medical restrictions that are
23  reflected in Exhibit 2, correct?
24    A.  Uh-huh.
25    Q.  And so at the time of the estate sale on

Page 51

1  August 30th, 2012, you were still on your medical
2  restrictions, correct?
3    A.  Yes.
4    Q.  And just explain who was holding the sale,
5  what -- I mean, was it a neighborhood?  Just kind of
6  explain what it was and why you wanted to go.
7    A.  Ronnie Sartors, it's his parents -- in-laws,
8  and they had both passed away.  And the estate sale
9  was -- it was outside of Overton.
10    I had -- you know, my oldest daughter was
11  getting ready to move out.  And, you know, I figured
12  there would be stuff that she -- spatulas and stuff like
13  that that I had but she did not that she could use.  And
14  so I went to look.
15    Q.  And did you go with anyone else?
16    A.  No.
17    Q.  And how did you get there?
18    A.  Drove.
19    Q.  And what kind of car do you have?
20    A.  I had a Lincoln Navigator at the time.
21    Q.  You mentioned Ronnie Sartors.  I believe he
22  was a former Postal Service employee.  Did you know him
23  personally?
24    A.  He's from Overton, yes.
25    Q.  Okay.

Page 52

1    A.  And worked at the Overton Post Office.
2    Q.  Was he a friend of yours?
3    A.  Acquaintance.  I really didn't -- I don't hang
4  out with him.
5    Q.  Okay.
6    A.  He was a retired postal supervisor.
7    Q.  And so other than Mr. Sartors, was there
8  anyone else at the estate sale that you knew?
9    A.  I knew Debbie Isaacs, she was a -- or is a
10  rural carrier at the Kilgore Post Office.  She's
11  actually an Overton carrier that's now at Kilgore.
12    And I knew Nancy Spencer.  She was the
13  mother -- or is the mother of a -- of a girl that I know
14  that worked at the New London Post Office.
15    And I kind of in passing knew Glenda.  I think
16  her last name was Baker.  She lives just a couple of
17  houses down from me.  And her husband is a retired clerk
18  from the Henderson Post Office and worked with Joe when
19  he was a carrier there.
20    Q.  That reminds me of something.  Who -- who
21  would you say, are you friends, personal friends with
22  anyone you work with at the Kilgore Post Office?
23    A.  There's a few.
24    Q.  Who would you say that you're -- you're
25  closest with at that -- at that office, just some of --

Page 77

1  Branch 132 NALC.  And now I believe he's the vice
2  president.
3       Q.   When did you -- okay.
4            From the time of the August 31st meeting with
5  OIG, when did you resume your letter carrier duties, do
6  you remember?
7       A.   April 19th, 2013.
8       Q.   Okay.  So -- so between that meeting and
9  your -- when you received the notice of removal -- I
10  think the notice of removal was effective November 15th,
11  2012; is that -- is that right?
12      A.   To the best of my knowledge.
13      Q.   Okay.
14      A.   I couldn't tell you the exact day.
15      Q.   So from the time of your accident on
16  August 21st until the time you returned in April of
17  2013, you never went back to your -- doing your city
18  carrier route, right?
19      A.   No.
20      Q.   Okay.  Do you remember when you -- when you
21  were informed that -- that your -- that you were being
22  terminated essentially?
23      A.   I received the letter of removal in the mail.
24      Q.   Oh, in the -- okay.  In the mail?
25      A.   Yes.

Page 78

1       Q.   Okay.  And then after getting that, I guess at
2  some point you filed a grievance related to the removal?
3       A.   The -- there were -- was a grievance filed.
4  Because when he put me off the clock, he put me off the
5  clock on what's called a 16-7.  It's a emergency
6  placement, I believe is what it's called.  Something
7  like that.
8            And so there was -- there was a grievance
9  filed on that.  And then once the letter of removal was
10  issued, we filed a grievance on that.
11      Q.   Okay.  During the grievance process -- and
12  during that you had representation from the union,
13  correct?
14      A.   Yes.
15      Q.   Did you ever during the grievance process
16  contend or argue that the reason that you got the notice
17  of removal or received any form of discipline related to
18  the allegation that you violated your work restrictions,
19  during that grievance process, did you ever contend or
20  allege that the reason these actions were being taken
21  against you was because of any form of retaliation for
22  engaging in protected activity?
23      A.   I couldn't tell you exact.  I'm sure I
24  probably did with my union representation, but they will
25  only deal with a contractual issue.

Page 79

1       Q.   And at some point you filed an EEO case,
2  correct?
3       A.   Yes.
4       Q.   And did you do that on the advice of anyone,
5  or did you come to that decision on your own?
6       A.   Actually on the advice of the union.
7       Q.   Okay.  And were they helping you through that
8  process?
9       A.   The EEO process?
10      Q.   Yeah.
11      A.   No.  They didn't -- they will only deal with
12  the contractual issues.
13      Q.   Okay.  But ultimately through the grievance
14  process, there was ultimately an arbitration, correct?
15      A.   Yes.
16      Q.   Okay.
17      A.   For the second one.  The first one was
18  settled.
19      Q.   Okay.  And the arbitrator essentially agreed
20  with you that the notice of removal was -- was
21  unjustified, correct?
22      A.   Yes.
23      Q.   And so he or she awarded you full restoration
24  of lost pay and benefits, correct?
25      A.   Back pay, yes.

Page 80

1       Q.   And did you receive that?
2       A.   Yes.
3       Q.   And in this lawsuit, you're not claiming or
4  seeking any damages or money for that -- that time frame
5  between when you were terminated -- your termination was
6  effective and --
7            MS. FISHER:  I'm just making sure she
8  knows --
9            MR. VISOSKY:  Yeah.
10           MS. FISHER:  -- I'm going to place an
11  objection.
12           MR. VISOSKY:  Sure.
13           MS. FISHER:  Go ahead.
14      Q.   (By Mr. Visosky) Let me re-ask it.
15           In this lawsuit, are you claiming any -- well,
16  let me ask it this way:  Is there any part of this
17  lawsuit where you're seeking damages for pay or benefits
18  during the time between when your termination was
19  effective and you returned to work in April 2013 that
20  you were entitled to but didn't receive?
21      A.   No.
22      Q.   And I'm not talking about -- I understand you
23  have compensatory claims and that sort of thing.
24           So once your termination was effective or even
25  before that when you found out about it, did you apply

Page 81

1  for any -- any jobs to support either yourself or your
2  family?
3      A.  I applied for unemployment.
4      Q.  Okay.  Unemployment compensation?
5      A.  Yes.
6      Q.  Okay.  And that was with the Texas Workforce
7  Commission?
8      A.  Yes.
9      Q.  Okay.  And how long did that whole process
10 take?
11     A.  I believe I filed in December of 2012, and my
12 claim was denied.  I appealed it.  I won the appeal.  I
13 believe I received the first check in March of 2013.
14     Q.  Okay.  So apart for applying for unemployment
15 compensation, did you apply for any jobs?
16     A.  I was required through the Texas Workforce
17 Commission to do a search on their website for jobs that
18 I was qualified for.  And there were no jobs within my
19 area that I qualified for, but I did do my searches.
20     Q.  When you say jobs that you were qualified for,
21 what do you mean?  I mean, what would you consider a job
22 that you were qualified for?
23     A.  Carrying mail.  Computer work.  That was
24 basically the -- what I had done in the last 20 years,
25 or 15 at the time.

Page 82

1      Q.  After you received or found out about the --
2  the termination, did you seek any medical help during
3  that time?
4      A.  Medical...?
5      Q.  I mean, did you go to any doctors for any
6  reason?
7      A.  Relating --
8      Q.  Yeah.  Let's say related to your receipt of
9  notice of removal.  Did that affect you emotionally?
10     A.  Yes.
11     Q.  Okay.  And -- well, first of all, just
12 describe, you know, how it affected you emotionally.
13     A.  I think I went through every emotion there was
14 on a daily basis.  You know, anger, upset.  All of it.
15     Q.  Did you seek any medical treatment for any
16 emotional distress you may have suffered from the
17 termination?
18     A.  Can I get some water?
19        MR. VISOSKY:  Absolutely.  Let's just
20 take a break.
21        (9-minute break taken.)
22        (Exhibit 5 marked.)
23     Q.  (By Mr. Visosky) All right, Mrs. Cox, we're
24 back on the record.
25        I did just want to ask you, we received from

Page 83

1  your attorney a copy of an MP3 file that included a
2  recording.  I would just like to play it -- not the
3  whole thing for you, because I understand there's not a
4  whole lot in the beginning of it.
5        Let me just start it up here.
6        MR. VISOSKY:  And this, for the record,
7  is on a CD that's been marked as Exhibit 5 to the
8  deposition.
9      A.  I believe it's probably the last two minutes.
10        (Video clip begins.)
11     Q.  (By Mr. Visosky) First of all, just while this
12 is going on in the background, we're hearing kind of
13 a -- let me turn down the volume.
14        What -- what is this?  What are we listening
15 to right now?
16     A.  This is me walking.
17        (Video clip stopped.)
18     Q.  (By Mr. Visosky) Okay.
19     A.  That noise, the beep you heard was my badge,
20 me coming in the back door.  I on this particular day
21 received a phone call from a fellow carrier saying that
22 I had a -- an additional hamper of packages that were
23 not by where my case is or where my original hamper of
24 packages were that I was unaware of.  And so I drove
25 back to the Post Office.  And the beginning of it is me

Page 84

1  loading all of these packages and --
2      Q.  And -- I'm sorry.
3      A.  Go ahead.
4      Q.  What day was -- was this recorded?
5      A.  April the 26th, 2013.
6      Q.  And what day did you return to work after you
7  received the arbitrator's award?
8      A.  April 19th, 2013.
9      Q.  So this is a week after you returned to work?
10     A.  Yes.
11     Q.  And why did you decide to record you walking
12 into the Post Office?
13     A.  The main reason is because when I came back
14 in, I realized that Joe was not -- who had been there at
15 the Post Office that morning, but he was not there and
16 Cynthia Freeman was.
17     Q.  And so why would that make a difference of
18 why -- if Joe wasn't there, why would you --
19     A.  Because at this point, I had already had
20 two -- at least two different interactions with her
21 where she was continuing the behavior of before I -- my
22 removal.
23     Q.  Okay.  So did -- when you were walking in to
24 the Post Office this day, April 26th, did you expect to
25 speak with Mrs. Freeman?

Page 85

1    A.  I knew I had to.
2    Q.  Okay.  And how did you know that?
3    A.  Because I was required to drive back to the
4    Post Office and load these packages and drive back to my
5    route, which takes time.  And everything to do with the
6    city carrier's job --
7    Q.  Okay.
8    A.  -- is about time.
9    Q.  Okay.  And so you were -- had you already done
10   your route for the day?
11   A.  No.  I had already begun my route, but I
12   wasn't very far --
13   Q.  Oh, okay.
14   A.  -- into the route.
15   Q.  I misunderstood you.  So you were already
16   out --
17   A.  Yes.
18   Q.  -- on your route.
19       Then you get a call from one of your fellow
20   carriers that there's an additional hamper?
21   A.  Yes.
22   Q.  Okay.  And, I mean, what does that mean?  When
23   you get the mail from the Post Office to your mail truck
24   or whatever, what's that mean, there's an additional
25   hamper?

Page 86

1        Is the mail like set out in hampers and then
2    each carrier has a certain...?
3    A.  Yes.  We have hampers that are lined up in
4    one, two, three -- which there's no city four -- five,
5    six, seven.  We all have our own hamper.  They have our
6    numbers on them.
7        And then they have these little heavy -- or
8    like gray tub things that are hung on them.  And what we
9    call a parcel is anything basically that won't fit in a
10   mailbox.  And then what we call a spur is -- it's a
11   package -- it's not a magazine or a flat, as we call
12   them -- but it's small enough that it will fit in a
13   mailbox.
14       So all of our stuff is in those; our packages,
15   our spurs.  The mail is brought to our cases.  So I case
16   my mail.  I get my hamper.  I put my mail in my hamper,
17   take it out, deliver.
18   Q.  Okay.  So when you get a call from the carrier
19   there's an additional hamper, was it a hamper that you
20   missed or it was something that was added to your route
21   or what?  Just explain what it was.
22   A.  I actually spoke with Joe McQuiston, I
23   believe -- I believe this was on a Friday, and I believe
24   I spoke with him on that next Monday.  And I asked him
25   if he was aware that I had to come back.  And he said,

Page 87

1    yeah, he said, that was my fault.  I had -- you know, I
2    forgot to tell you that you had another package --
3    hamper.
4        And it was not there.  There's all kinds of
5    other equipment that other people use, so it's kind of
6    difficult to put an extra hamper right there.
7        And he made the comment that one of the other
8    carriers -- I think he might have said Gary -- that I
9    never have to tell Gary; he just knows if there's no
10   packages in your hamper, that he probably has another
11   one.  And stated, well, I had packages in my hamper, so
12   I just thought it was a light day.
13       Because I was used to being told or -- you
14   know, or seeing it or whatever.  And I don't -- I had no
15   idea where it was at --
16   Q.  Okay.
17   A.  -- in the Post Office.
18   Q.  And I just want to get the timing down.  So
19   you're on your route.  You get a call from a carrier
20   saying there's this hamper.  And then after that, you
21   call Mr. McQuiston?
22   A.  No.  I came -- I came back to the Post Office.
23   Q.  Oh, so you talked with him personally?  I
24   thought he wasn't there that day?
25   A.  He was there that morning.

Page 88

1    Q.  Uh-huh.
2    A.  And he ran the floor.
3    Q.  Yeah.
4    A.  I received the call from a fellow carrier.
5    Actually, she is a rural carrier.  Her husband is a city
6    carrier.  And --
7    Q.  Who was it?  I'm sorry to interrupt.
8    A.  Kelly Watson.  Her husband is David Watson.
9        And I don't know if maybe David didn't have my
10   phone number, I don't know.  But David noticed that
11   there was a hamper there with packages for the route
12   that I was on.  So he asked his wife to call me to let
13   me know.
14       So I left the route, drove back to the Post
15   Office, loaded the packages up, lined them up in my
16   truck by order, and then came back in.  And that's when
17   I went to the desk and talked to Cynthia Freeman.
18   Q.  So when did you talk with Mr. McQuiston?
19   A.  On the Monday after.  This was on a Friday, I
20   believe.
21   Q.  Oh, okay.  So you didn't talk with him on
22   April 26th?
23   A.  No.
24   Q.  Okay.
25       And so -- okay.  Before we listen, just tell

Page 89

1  me what happened when you go into -- when you come back
2  from the route, I guess to pick up this extra hamper or
3  whatever, what happens then.
4     A.  I took the packages out and loaded them in my
5  vehicle, lined them up with the packages I already had.
6  Brought the hamper back in.
7        I went over to the desk and I said, I am
8  probably still going to be okay, but do you want me to
9  fill out a 3996 -- which is a slip asking for
10  overtime -- just in case.  And she says, you do what you
11  need to do to cover yourself.  And I said, okay.
12        And then so I went around the -- the computer
13  is facing this way (indicating), so I'm standing here
14  talking to her.  So I went around to the desk drawer
15  that the 399 -- the blank ones are in.  And I pulled one
16  out and I pulled it up on the desk and I started filling
17  it out.
18        Well, then she -- so she has her back to me.
19  And then she turns and she's like, what are you doing?
20  And I'm -- I was kind of confused because I had just had
21  this conversation.  And I said, I'm just putting this in
22  for 15 minutes.  I'm probably still going to be okay.
23  And she said, well, you know those have to be in by
24  8:45.  And I said, I'm not -- you know, I didn't know at
25  8:45 that I had an additional hamper and it's, you know,

Page 90

1  taken me at least 15 minutes to drive back here and do
2  all that.
3        And she said, I believe, something to the
4  effect of well, did you get with Joe?  And I said, no,
5  he's already -- he's not here.  And she said, it was --
6  something like, I'm not -- it doesn't matter or -- it's
7  the same or something.  And I said, well, this is
8  different.  This is not a normal -- this was different.
9  And she's like, no, it's the same.  And I was just like --
10  play games with you.  And I was just like, okay.  And
11  you know, so I said, I'll do my best.
12        And it's hard to hear.  You have to really
13  listen because I'm actually walking away and so you've
14  got that noise.  But if you listen really hard, you can
15  hear her say, well, you're going to have to do better
16  because your best ain't good enough.
17     Q.  Okay.  And did you end up filling out the
18  form, whatever the form is --
19     A.  For 15 minutes.
20     Q.  -- for overtime?
21        Before you went back out on your route?
22     A.  Yes.
23     Q.  And did you get that overtime?
24     A.  I -- I couldn't tell you if I went over or
25  not.

Page 91

1     Q.  Okay.  Okay.  Let me see.
2        MR. VISOSKY:  And again, just for the
3  record, I'm going to play what's been marked as
4  Exhibit 5.
5        (Video clip begins.)
6     Q.  (By Mr. Visosky) And let me fast forward.  You
7  can see the timing on it, just so you're not like...
8     A.  Yeah, it's --
9     Q.  It's just a lot of like --
10     A.  It's probably close to the last couple of
11  minutes.
12        (Video clip stopped.)
13     Q.  (By Mr. Visosky) Why are you recording all of
14  this part?  Like, I mean --
15     A.  Because I had already -- I had been back to
16  work at this point one week.
17     Q.  No, no, no.  I mean -- I mean, I understand
18  why you might have wanted to record any conversation.
19  But like, was anyone around at this point?  Like why
20  were you recording like...?
21     A.  That's just because I had learned in that one
22  week that I -- I couldn't -- if she was there and he was
23  not, it was very likely I was going to get accosted.
24     Q.  What about -- and by "accosted," you don't
25  mean physically, right?

Page 92

1     A.  No.  I just -- you can tell by the tone of the
2  voice and just -- and saying what she said.
3     Q.  How -- how is this -- what were you recording
4  this on?
5     A.  I had a digital recorder in my pocket.
6     Q.  Okay.
7        (Video clip begins.)
8     A.  That's it.
9     Q.  (By Mr. Visosky) Is that the start of it?
10     A.  That was me saying I'm probably going to be
11  okay.
12     Q.  Oh, wait.  I'll back up.
13        (Video clip stopped.)
14        MR. VISOSKY:  And just fort the record,
15  I'm starting playing continuously from what's marked on
16  the screen as 9 minutes 10 seconds on Defendant's
17  Exhibit 5 -- or Deposition Exhibit 5.
18        (Video clip begins.)
19        (Video clip stopped.)
20     Q.  (By Mr. Visosky) Let me just -- in the
21  background, this is at 10 minutes 50 seconds, the person
22  talking just a second -- I mean, not --
23     A.  Somebody across the room.  I don't know.
24     Q.  Okay.  That's -- okay.
25        (Video clip begins.)

Page 93

1      (Video clip stopped.)
2      Q.   (By Mr. Visosky) What -- and I take it -- now
3  we're at 11 minutes, 18 seconds.  The voice we just
4  heard, was that Mrs. Freeman?
5      A.   Uh-huh.
6      Q.   If you know, what she's talking about 8:45 and
7  you have to do something by a certain time?
8      A.   She's saying the 3996 that I spoke about
9  that's asking for overtime, --
10     Q.   Uh-huh?
11     A.   -- that they have a general rule that you're
12 supposed to have that in by I think she said 8:45.
13 Normally, I think at that time we were coming in at
14 7:30, so it was about 8:30, 8:45.  That way the
15 supervisor or the Postmaster has time to determine
16 whether or not you were -- you are entitled to any
17 overtime and they can approve or disapprove it and tell
18 the carrier.
19     Q.   Okay.
20         (Video clip begins.)
21     A.   That's -- you heard it?
22         And that's just me walking out.
23         (Video clip stopped.)
24     Q.   (By Mr. Visosky) Okay.  Is that the --
25     A.   Yeah.

Page 94

1      Q.   -- the end of the voice part?
2      A.   Uh-huh.
3      Q.   Okay.
4          Did you have any further interaction with
5  Mrs. Freeman that day?  And again, that would be
6  April 26th.
7      A.   I don't -- I don't recall.  Probably not.
8      Q.   Okay.  Did you make any -- well, first of all,
9  what we just heard and how Mrs. Freeman spoke and what
10 she was saying, I mean, do you find any -- I mean, is
11 there anything objectionable about that or did that --
12     A.   Telling somebody they better do better because
13 their best isn't good enough is absolutely
14 objectionable.
15     Q.   Did you complain to anyone about it?
16     A.   Yes.
17     Q.   Who?
18     A.   Joe McQuiston.
19     Q.   When?
20     A.   On April the 29th.
21     Q.   Okay.  That would have been the Monday --
22     A.   Yes.
23     Q.   -- the following Monday?
24     A.   Yes.
25     Q.   Okay.  The 26th was what?

Page 95

1      A.   I believe Friday.
2      Q.   Okay.
3      A.   So I believe it was Monday.
4      Q.   And what did you tell Mr. McQuiston?
5      A.   I asked him if he was aware that I had to come
6  back.  And he said that, yes, that -- that was my fault.
7  You know, I apologize.  You know, I forgot to tell you
8  that you had another hamper.  I never have to tell --
9  whoever he said -- because they know if they don't have
10 hampers in their parcels.  And I said, I did have -- I
11 did have parcels in my hamper.  And he said oh, okay.
12         Then I said -- I told him what -- exactly what
13 happened on -- you know, what she said to me.  And he
14 was, you know, just like, okay, I'll talk to her.
15         And then I stated that I feel like she is
16 harassing me and that I feel like she is creating a
17 hostile work environment for me.
18     Q.   And what did he say or do?
19     A.   Okay, I'll talk to her.
20     Q.   And do you know if he did talk to her?
21     A.   I have no idea.
22     Q.   Did you ever receive any discipline as a
23 result of this incident?
24     A.   Not this incident, --
25     Q.   Okay.

Page 96

1      A.   -- no.
2      Q.   And I think you said earlier -- and correct me
3  if I'm wrong -- that you're not sure whether you
4  submitted or received the overtime pay for taking an
5  extra hamper?
6      A.   I have -- no, I don't know that particular
7  day.
8      Q.   Okay.  So after April 26th, 2013, was there
9  any other encounters or things that Mrs. Freeman did
10 that you were -- you are claiming or contending was
11 hostile?
12     A.   I believe for the most part, any particular
13 instance like that one not until October.  Well, it was
14 actually the very end of September.
15     Q.   And just tell me what happened then.
16     A.   Joe was vacation, training somewhere; he was
17 not there that entire week.  She every morning pretty
18 much was coming over and just questioning me about
19 saying that I went over on my office time, when I knew
20 that I didn't.  Just constantly questioning me about my
21 route, my performance.
22         And I was performing the exact same way that I
23 always did when Joe was on the floor, and he never had
24 to question me or said that I went over or -- because
25 I -- I'm a very hard worker.  I try my best.

Page 97

1    I understand it.  You know, I understand that
2    I'm allowed this much time for this, and I -- so I don't
3    take more time.
4         And then it all came down to August -- I mean,
5    October the 4th, which was a Friday.  And I had put in a
6    annual leave slip to ask to be off at 1:00 p.m.  I had
7    an appointment at 1:15 p.m.  And I had -- in Overton, so
8    I had just enough time to get to it.
9         And that morning -- and this --
10        (Computer beeping.)
11   Q.   (By Mr. Visosky) Sorry.
12   A.   That was not me.
13        And this -- that morning when the schedule had
14   been made, it had been wrote on the schedule, leave,
15   1:00 p.m.
16        And so I came in that morning.  We -- we began
17   work at -- I think at that time it was 7:00 p.m.  And so
18   without -- no.  It was 7:30 p.m.
19        MS. GEGEN:  Do you mean a.m.?
20        THE WITNESS:  Yes, a.m.  I'm sorry.
21   A.   7:30 a.m.
22        So without a lunch, without taking a
23   lunch, my eight hours would be 8:30.  And I had -- let's
24   see.  This was -- yeah, I had a mini bid, and so I was
25   on the same route every day.  And so for me to be able

Page 98

1    to be off by 1:00 p.m., the management would have to
2    take two and a half hours off of my route and hand off
3    to other carrier or carriers.
4         Angie Rojas, who is actually now our
5    supervisor, was a 204-B at the time.  And so since Joe
6    was not there, Cynthia was running the floor, Angie was
7    the p.m. supervisor.
8         And Angie had came in.  And she come over and
9    she gives me a 3996, which is the overtime slip and --
10   because what will happen is, if they're having to take
11   mail off of me, they will fill one out.  And then
12   they'll give it to me, and it says what territory I'm
13   going to give off.  And then they give it to that --
14   like the carrier who is going to carry its name down
15   here.  And then there's a place where they can keep up
16   with their time.
17        And she brought me one that said an hour and
18   54 minutes.  The territory that they took off is
19   actually the route that is my regular route now and was
20   pretty of the same back then, and it was around an hour
21   and a half.  And -- but she put on the paper an hour and
22   54 minutes.
23        I told Angie at that time that she brings me
24   this 3996 that's not enough.  I have to be off by
25   1:00.  I had an appointment.

Page 99

1         And she said, I don't know; that's just what
2    she gave me.  And I said, okay.  Well, I will do every
3    bit that I can, but I have to be gone by 1:00 p.m.  And
4    so any that I can't continue, I will bring back and let
5    y'all know.
6         And there was, I think, 20, 25, maybe 30
7    minutes at the very, very end of the route that I could
8    not complete.  I did not take a break.  I did not stop
9    for anything.  I went as fast as I could to get as much
10   done.
11        And when I brought it back, she started -- she
12   came out.  I told her, this is --
13   Q.   I'm sorry, who is "she"?
14   A.   Cynthia.
15   Q.   Okay.
16   A.   Angie was not there at the time.
17        Cynthia came out.  I said, there's 20, 25
18   minutes, 30 minutes there.  And she said, no, ma'am, you
19   go back out there and carry it right now.  And I'm like,
20   no, ma'am.  I have a leave slip and I have to leave at
21   1:00.  No, you're going back and carrying it right now.
22   I said, no, ma'am, I am not.  I have an approved leave
23   slip to leave at 1:00.  No you don't.  That's incidental
24   leave.  I said, that doesn't matter, it's approved.
25   It's even on the schedule.  I have to leave at 1:00.

Page 100

1         And then she -- she's yelling at me, I'm --
2    I'm going to -- I'm going to report you for delaying the
3    mail.  And I said, no, ma'am, I am not.
4         And so she started toward the supervisor's
5    desk and I went toward the time clock.  And right as I
6    was clocking off, she's screaming at me, you better not
7    leave this building.  I'm giving you a direct order.
8         And I clocked -- I had clocked off, I went to
9    my car, and I left.
10        And then on I believe it was -- oh, and at
11   some point in that she said, don't come back in this
12   building without a union steward.
13        And so I went and -- to my appointment.  And I
14   believe I was off -- I believe I was on annual leave on
15   that next day on that Saturday.  I believe my regular
16   day off was Monday.
17        And then so Tuesday, I believe it was, when I
18   came back in, she called me into the office.  I informed
19   her that I wanted Laura Maglaris, who is a union steward
20   in Longview, to represent me.
21        She got her over there.  And she did an
22   investigation -- you know, what they called an INI
23   investigation.  And then she issued me a letter of
24   warning.
25   Q.   And what was the letter of warning for?

Page 101

1    A.  I believe she -- it was for failure to follow
2    instructions, I believe.
3    Q.  Okay.  And did you speak with Joe McQuiston
4    about any of this?
5    A.  Oh, yes.  When he returned.  I'm not sure
6    when -- when he returned after that.
7        But I'm sure I told him about it.  But at this
8    point I had come to the conclusion that she was just
9    going to continue, and so I filed a second EEO.
10   Q.  You mentioned that -- that -- and again, I
11   forget the -- it was October --
12   A.  Fourth.
13   Q.  -- 4th, that you had submitted a leave slip
14   was -- and you said it was approved, right?
15   A.  Yes.
16   Q.  And do you know what supervisor had approved
17   it?
18   A.  Joe.
19   Q.  And was there something -- well, approved.
20   Was there something in writing that was signed by him?
21   A.  Yes.  There's a -- it's called a form 3971,
22   that when we want time off -- whether it's sick leave,
23   annual leave, court leave, whatever -- we're required to
24   fill it out.
25   Q.  What's the difference between incidental leave

Page 102

1    and --
2    A.  The only difference is that we have a -- our
3    vacation time is -- we have a choice leave calendar, the
4    city carriers and the clerks do.
5        And so basically they put every week -- the
6    vacation week, even though our postal week starts on
7    Saturday, it starts on Sunday.  They list every single
8    week from Sunday to Saturday.  Then in order of
9    seniority, it goes through a rotation twice.  And
10   usually November, December, we sign up for what weeks we
11   want.  That is called choice leave.
12       Anything else is incidental leave.
13   Q.  Okay.  Are there any policies in place that
14   require if you have an approved leave slip for
15   incidental leave -- well, let me -- let me back up.
16       Would you agree that this was incidental
17   leave?
18   A.  It was incidental leave, yes.
19   Q.  It was.  Okay.
20       Are there any policies or rules within the
21   Postal Service that you're aware of that if you submit
22   an approved request for incidental leave, that you're
23   entitled to -- to get that leave?
24   A.  It's approved, yes.
25   Q.  Okay.  Did you ever file any kind of grievance

Page 103

1    as a result of this incident?
2    A.  I filed a grievance on the letter of warning
3    that I received, and it was dropped.
4    Q.  And what was it -- was it dropped entirely?
5    A.  Yes.
6    Q.  Okay.
7        MS. GEGEN:  Just to clarify:  Was the
8    letter of warning dropped or the grievance dropped?
9        THE WITNESS:  The letter of warning was
10   dropped.
11       MS. GEGEN:  Okay.
12   A.  That's what the grievance was on.
13   Q.  (By Mr. Visosky) Okay.
14   A.  Again, the union will only deal with
15   contractual issues.  And the letter of warning was
16   corrective action, which was a contractual issue.
17   Q.  And you have no recording of the October 4th
18   interactions with Mrs. Freeman?
19   A.  I believe I do.  I'm still kind of searching
20   my computer.  They're not numbered.  And I've been
21   fighting with my computer.  I believe I -- I actually
22   believe I do have that --
23   Q.  Okay.
24   A.  -- but I haven't been able to find.
25   Q.  Other than possibly the October 4th and the

Page 104

1    October -- or April, whatever, 26th recording that we
2    listened to earlier, are there any other recordings?
3    A.  I'm -- I'm sure there is.  I believe that I
4    might have, if I can find it, the one where on the 29th
5    when I reported it to Joe.
6    Q.  Okay.
7    A.  I believe.  Like I said, I'm kind of fighting
8    with my computer at the time.  I'm trying to find it.
9    Q.  Are --
10   A.  I thought I had them named, but...
11   Q.  Are there any recordings that -- that you
12   might have where nothing in particular may have
13   happened?  I mean, you expected some kind of encounter
14   with some employee or another, and just nothing
15   happened?  Where you just recorded it, but there's
16   really no one speaking or nothing...?
17   A.  If that was the case, then I deleted it.
18   Q.  Okay.  Like how many times would you say --
19   not the recordings that you kept.  But how many times
20   between when you returned to work and April of 2013 and
21   today would you say you recorded something that happened
22   at at -- at the Postal Service?
23   A.  I have no idea, I really don't.
24       Like I said, if Joe was there, then nothing
25   would happen.  I -- I learned cars.  When I came in the

Page 109

1    Q.  (By Mr. Visosky) Not the page number, just the
2    little --
3          MS. FISHER:  If you don't mind, just a
4    second and I'm going to show you what he's talking
5    about.
6          MS. GEGEN:  Page 3.
7          MS. FISHER:  Yeah.  It's paragraph
8    numbers.
9    A.  Oh, okay.
10   Q.  (By Mr. Visosky) This is -- these allegations
11   related to allegations of hostile work environment
12   directed towards Mrs. Freeman's alleged conduct.  And
13   you -- you allege in there that Mrs. Freeman was hostile
14   or harassing to white female employees.
15        Is it -- is your allegation that she
16   discriminated against or was hostile towards just white
17   people generally or females generally or specifically
18   white females?
19   A.  This -- this actually talks about before my
20   removal.
21        MS. FISHER:  Okay.  But what --
22   A.  Yes, it was white females.
23        MS. FISHER:  Okay.  But I want you to
24   listen carefully to his question and answer it.
25        THE WITNESS:  Okay.

Page 110

1    Q.  (By Mr. Visosky) So Mrs. Freeman -- just for
2    the record, she is African-American, correct?
3    A.  Yes.
4    Q.  So are -- did you ever witness her being
5    harassing to -- to white males?
6    A.  No.
7    Q.  Okay.  What about black females?
8    A.  No.
9    Q.  Okay.  Any other races?  I mean Hispanic?  Do
10   any other races work at the -- at the Kilgore Post
11   Office?
12   A.  We have -- at that time, I -- at least one
13   Hispanic.  I don't know -- I don't think there was
14   any, no.
15   Q.  Okay.  Are you aware whether any white male
16   employees have filed EEO complaints related to
17   Mrs. Freeman's conduct?
18   A.  No.
19   Q.  Going back to Paragraph 10 in Exhibit 6.  You
20   allege that you reported or told Mr. McQuiston about
21   what you believe to be Mrs. Freeman's having created a
22   hostile work environment at the Post Office.  And you
23   allege that -- that he did not properly report Cox's
24   complaint of a hostile work environment in direct
25   violation of USPS -- I think it's supposed to say --

Page 111

1    "USPS policies."  And Supervisor Freeman was not
2    separated from the Workforce subject to an
3    investigation, which is in violation of USPS's policies.
4    And then it says, as written in Title VII of the
5    discrimination law.
6          Are you aware of any particular Postal Service
7    policy that requires a supervisor or manager to separate
8    another supervisor or manager who has had allegations
9    against them of having created a hostile work
10   environment?
11   A.  To my knowledge, it is postal -- there's a
12   postal rule and an EEO rule that if something is
13   alleged, then that person is supposed to be removed
14   until the investigation is conducted.
15   Q.  So your understanding is if -- if an employee
16   of, say, the Kilgore Post Office complains about a
17   particular supervisor, that supervisor can't have --
18   that they have to be separated from the complaining
19   employee or from their duties --
20   A.  I don't --
21   Q.  -- entirely until the investigation is
22   conducted?
23   A.  I -- to my knowledge, I think from what I
24   understand is that they have to be -- they're supposed
25   to be taken out of that environment until the

Page 112

1    investigation is conducted.  And that, from my
2    knowledge, I believe an outside person is supposed to
3    come in and investigate that.  And I know that never
4    happened.
5    Q.  Okay.  So what I think I'm hearing, correct me
6    if I'm wrong, like, for example, when -- when you went
7    to complain to Mr. McQuiston about Mrs. Freeman, you
8    believe that he was required under Postal Service policy
9    to remove her from being a customer service supervisor
10   until the investigation was conducted and completed?
11        MS. FISHER:  Objection, form.
12        But you can answer the question.
13   A.  After my removal, I believe that once I
14   learned -- I gained a lot of knowledge throughout that
15   process.  I don't think I knew that before.
16   Q.  (By Mr. Visosky) Okay.  And you might not be
17   able to do it, but I'm just going to ask.  I mean, can
18   you identify any particular -- like what's your
19   understanding of this Postal Service policy -- this
20   alleged Postal Service policy, based on is there any
21   particular handbook or booklet or --
22   A.  I have no idea.
23   Q.  -- thing you can point to?  Okay.
24        (Exhibit 7 marked.)
25        MS. FISHER:  Thank you, sir.

Page 161

1    A.  Do I have an account that says it's a savings
2  account in a bank?
3    Q.  Right.
4    A.  No, I don't.
5    Q.  Okay.  Do you have any other family wealth or
6  interest that we haven't talked about today, like oil
7  somewhere, --
8    A.  No.
9    Q.  -- an inheritance or anything?
10    A.  Unfortunately, no.
11    Q.  Well, Mrs. Cox, I know this was difficult.
12  But I thank you for coming in today and answering my
13  questions.
14              MR. VISOSKY:  That's all I've got right
15  now.
16              MS. FISHER:  I'll reserve my questions.
17              (Proceedings concluded at 1:35 p.m.)
18
19
20
21
22
23
24
25

Page 162

1          CHANGES AND SIGNATURE
2
3  WITNESS:  KIMBERLY COX
4  DATE OF DEPOSITION:  DECEMBER 1, 2016
5
6  PAGE/LINE  CHANGE          REASON
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23
24      I, KIMBERLY COX, have read the foregoing deposition
25  and hereby affix my signature under the penalty of

Page 163

1  perjury that same is true and correct, except as noted
2  above.
3
4              _____
5              KIMBERLY COX
6  THE STATE OF _____)
7  COUNTY OF _____)
8
9    Before me, _____, on this day
10  personally appeared KIMBERLY COX, known to me or proved
11  to me under oath to be the person whose name is
12  subscribed to the foregoing instrument and acknowledged
13  to me that he/she executed the same for the purpose and
14  consideration therein expressed.
15    Given under my hand and seal of office on this
16  _____ day of _____, 2016/2017.
17
18
19              _____
20              NOTARY PUBLIC IN AND FOR
                THE STATE OF
21
22
23  My Commission Expires: _____
24
25

Page 164

1        IN THE UNITED STATES DISTRICT COURT
2      FOR THE EASTERN DISTRICT OF TEXAS
            MARSHALL DIVISION
3  KIMBERLY L. COX,          )
4    Plaintiff,        )  )
5  vs.              )  CIVIL ACTION NO.
6  MEGAN J. BRENNAN,      )  2:14-CV-00810-JRG-RSP
7  POSTMASTER GENERAL OF THE  )
   UNITED STATE, U.S. POSTAL  )
8  SERVICES,            )
9    Defendant.        )
10
11
12          REPORTER'S CERTIFICATE
13       ORAL DEPOSITION OF KIMBERLY COX
14             DECEMBER 1, 2016
15
16    I, Brenda Hightower Smith, Certified Shorthand
17  Reporter in and for the State of Texas, hereby certify
18  that this deposition transcript is a true record of the
19  testimony given by the witness named herein, after said
20  witness was duly sworn or affirmed by me;
21    That the deposition transcript was submitted on the
22  _____ day of _____ 2016, to the
23  witness/attorney for examination, signature, and return
24  to me by the _____ day of _____, 2017.
25    That $_____ was the charge for the original

Page 165

1   deposition charged to the Attorney for the Defendant.

2      That pursuant to the information given to the

3   deposition officer, the following includes all parties

4   of record and the time used by each party:

5      Mr. Visosky (4 hrs, 6 mins.)
       Attorney for the Defendant

6   Ms. Fisher (0 mins.)
       Attorney for the Plaintiff.

7

8      I further certify that I am neither attorney nor

9   counsel for, related to, nor employed by any of the

10  parties to the action in which this testimony was taken.

11  Further, I am not a relative nor employee for any

12  attorney of record in this cause, nor do I have a

13  financial interest in this action.

14     Subscribed and sworn to on this the 19th day of

15  December, 2016.

16

17

18

19

20

21

22     BRENDA HIGHTOWER SMITH, CSR, RPR, FCRR
       Texas CSR No. 3107
       Expiration Date:  12/31/2018

23     DepoTexas, Inc.
       Firm Registration No. 793

24     100 E. Ferguson, Suite 900
       Tyler, Texas  75702

25     903-593-3213